UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK COLEMAN,

               Plaintiff,             CASE NO. 19-13034
                                    HON. DENISE PAGE HOOD

v.

MICHAEL E. DUGGAN, *et al.*,

               Defendants.

_____/

## **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [#14]**

### I.      BACKGROUND

The instant matter involves Defendants Mayor Michael E. Duggan ("Duggan") and Detroit Department of Transportation's ("DDOT") (collectively "Defendants") Motion to Dismiss. [ECF No. 14]

### A. Procedural History

On October 15, 2019, Plaintiffs Dr. Derrick Coleman ("Coleman"), Deborah Harper, and River Rouge School District's ("the District") (collectively "Plaintiffs") filed a Complaint against Defendants. The Complaint alleges violations by Duggan of 42 U.S.C. § 1983 (Count I), violations by Duggan of Article I, § 5 of the Michigan Constitution  (Count II), violations by DDOT of 42 U.S.C. § 1983 (Count III), violations by DDOT of Article I, § 5 of the Michigan

Constitution  (Count IV), promissory estoppel against Defendant Outfront Media

Group ("Outfront") (Count V), and Breach of Contract by Outfront (Count VI).

Outfront was voluntarily dismissed by Plaintiffs as a defendant; Counts VI and VII

are also dismissed. [ECF No. 10]

On December 27, 2020, the remaining Defendants filed the instant Motion to

Dismiss because the parties agreed to limit their rights and remedies and for failure

to state a claim. [ECF No. 14] Plaintiffs filed their Response on January 16, 2020.

[ECF No. 18] Defendants filed a Reply on January 30, 2020. [ECF No. 20]

### B.  Factual Background

In Michigan, public schools receive a portion of their operating funds from a

state general revenue fund. [ECF No. 18, Pg.ID 126 n. 3] Ninety percent of state

funding is distributed on a per-pupil basis. [*Id.*] To increase the size of its school

district and ultimately gain more revenue from the state, the District implemented

an advertising campaign to attract students from surrounding school districts to

attend the District's schools. [*Id.* at Pg.ID 124]

The District began advertising on DDOT buses in 2012. [ECF No. 1, Pg.ID

4] The advertising campaign was part of a comprehensive effort to increase

awareness about River Rouge schools and increase the District's enrollment. [*Id.*]

The District frequently interacted with a third-party, Outfront Media Group

("Outfront") to purchase and coordinate its advertisements on DDOT buses. [*Id.* at

2

Pg.ID 3] Outfront is the exclusive entity that coordinates the DDOT advertisement program. [*Id.*]

The District's most recent agreement ("the Agreement") with OutFront scheduled advertisements for July 8, 2019-September 1, 2019. [ECF No. 1, Pg.ID 4] Despite this Agreement, Outfront informed the District in early July that the City of Detroit ("the City") terminated its advertisement campaign. According to the District, Outfront cancelled the agreement because "[t]he Mayor of Detroit ha[d] decided for DDOT to run only Detroit Public Schools advertising on the buses." [ECF No. 18, Pg.ID 126]

The District further alleges that Duggan purposefully targeted the District in his State of the City address in March 2018. [ECF No. 1, Pg.ID 6] The District also alleges that Duggan intentionally sought to prevent the District from advertising on DDOT buses to minimize public awareness about the District's busing program. [*Id.* at 5]

According to the City, it never promulgated such a policy. [ECF No. 14, Pg.ID 66] The City alleges that its policy banned all outside advertisements, including those from the Detroit Public Schools. [*Id.*] The City also indicates that it only intended to terminate the District's 2020 contract—not the 2019 contract. [*Id.*] Once learning about the mistake, through the instant lawsuit, the City explains that it sent a letter to the District informing it that the District could have free

advertising on DDOT buses through the end of 2019, which is what the original agreement provided. [*Id.*]

The District now seeks legal and equitable relief under federal and state constitutional law. The District is asking the Court for compensatory damages resulting from the alleged breach in contract with Outfront, actual and punitive damages for Defendants' actions, which violated the District's First Amendment and Michigan constitutional rights, a permanent injunction allowing the District to resume advertising with DDOT, and costs and attorney's fees.

## II.    LEGAL ANALYSIS

### A. Standard of Review — Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  This type of motion tests the legal sufficiency of the plaintiff's complaint. *Davey v. Tomlinson*, 627 F. Supp. 1458, 1463 (E.D. Mich. 1986).  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A court, however, need not accept as true legal conclusions or unwarranted factual inferences."  *Id.* (*quoting Gregory v. Shelby Cnty.*, 220 F.3d 443, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as

4

factual allegations will not suffice." *Edison v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

As the Supreme Court has explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see LULAC v. Bresdesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive dismissal, the plaintiff must offer sufficient factual allegations to make the asserted claim plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id.*)

### 1. The City is a Beneficiary of the Contract

The District contends that the City is not a beneficiary of the District's contract with Outfront, and that Outfront was not an "agent" of the City. The District claims that the term agent as it is used in its Complaint means "[s]omething that produces an effect." However, the City points out that the Contract explicitly requires that Outfront's ability to carry out the terms of any agreement is subject to approval from the City. [ECF No. 14-2, Pg.ID 78] (Exhibit 1). In response to the District's beneficiary argument, the City asserts that the Contract provided in capital

5

letters, on the first page, that all advertisements were subject to "the approval of the . . . owner of the location." [ECF No. 14-2, Pg.ID 79] Despite this language, the City further contends that the Contract is valid because "an undisclosed principal may claim the benefit of a contract, maintain an action thereon, and enforce any remedies which might have been pursued by the agent himself . . . ." *Grand Rapids Milk Producers Ass'n v. McGavin*, 295 Mich. 477, 481 (1940); *see also Citizens for Pretrial Justice v. Goldfarb*, 415 Mich 255, 283 (1982) (quoting *Jenness v. Shaw*, 35 Mich. 20, 21 (1876)) ("[T]he principle has been 'well settled and elementary', at least since 1876" that a principal may enforce the terms of an agreement made by his agent, "whether known to be such or not.")  Based on the express language, the City is the beneficiary of the Contract.

## 2.  First Amendment Waiver

The District argues that it did not waive its First Amendment rights because the Agreement contained no reference to any waiver of First Amendment rights. [ECF No. 18, Pg.ID 127] The City counters that constitutional rights may be waived if the waiver is voluntarily, knowingly, and intelligently made, with "clear evidence that there was an intentional relinquishment or abandonment of a known right or privilege." *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 690 (6th Cir. 2012) (internal citations omitted). Plaintiffs counter that the waiver is invalid because the contract was between Outfront and the District.

6

The District acknowledges that First Amendment rights can be waived but asserts that those waivers must be "closely scrutinize[d] and courts must "'indulge every reasonable presumption against a waiver.'" *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)). Constitutional waivers can only be upheld with "clear and compelling" evidence. *Id.*; *see also Nat'l Polymer Products, Inc. v. Borg-Warner Corp.*, 641 F.2d 418, 423 (6th Cir. 1981).

The District further contends that the waiver was not "intelligently" entered into because Outfront is a private business, and constitutional free speech concerns do not apply to private actors. Since the District entered into a contract with a private business, and the contract included boilerplate provisions, the District asserts that it could not have contemplated that such an agreement would restrict its free speech rights against the City.

The City argues that the District waived its right to sue for free speech violations because it expressly waived any right to control the timing and location of its "speech." To support this point, the City cites to the Contract, which provides that "character, design, text and illustrations on advertising copy and the material used shall be subject to approval by [Outfront] and by location owner, transit company/authority or third-party controlling location . . . ." [ECF No. 14, Pg.ID 70] Given such language, the City contends that the District did not have a right to

7

control the location of the advertisements, and the initial choice not to display the

advertisements could not have violated a constitutional right.

Next, the City argues that the District expressly waived its right to sue for

damages for failure to display advertisements, as evidenced by the language in

Section 4 of the Contract. Section 4 of the Contract provides:

> Any delay in commencing of service and/or posting of fewer locations
> than specified and/or resulting loss of advertising service caused by any
> reason whatsoever, shall not render [Outfront] liable for any damages
> or offsets of any kind.

[ECF No. 14-2, Pg.ID 81]

The City then indicates that the Contract provides exclusive remedies

for the failure to post advertisements. The remedies provision explains:

> If for any reason whatsoever during the term hereof (i) [Outfront] is
> unable to secure any specified location or loses the right to use any
> location, or (ii) any location becomes obstructed, destroyed or defaced,
> or (iii) [Outfront] fails to timely meet its posting requirements
> hereunder, [Outfront] shall have the option to replace lost locations with
> locations of equal value per [Outfront]'s prices and/or classifications,
> or to issue a pro-rated credit.

[*Id.*]

In addition to its arguments about constitutional waivers, the District

contends that the City's contract must be void against public policy. The District

argues that freedom of speech is a "fundamental value." According to the District,

the waiver must be invalidated to protect the nation's democratic principles by

8

ensuring that public dialogue is robust and informed. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

To further support this argument, the District contends that governmental entities could severely curtail free speech rights in a public forum by requiring a waiver. The District further asserts that governmental organizations would be motivated to require every designated or limited public forum user to sign a waiver before granting the user permission to use the forum.

The City counters that the District's arguments are speculative and against the enforcement of all waivers, not just the instant one. The City contends that the fact that individuals can waive First Amendment rights, implicitly means that an abstract impact on the public's listening rights is insufficient to overcome a valid waiver. *Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291 (2007). The City asserts that "the mere opportunity to act improperly does not compel an assumption that" every contractual waiver of rights with the government is invalid. *Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987). The City contends that the Court's discussion in *Rumery*, is especially instructive for cases like this, where there is no evidence of government misconduct.

The Court finds that the waiver is enforceable because it was made knowingly and voluntarily. While there may have been some boilerplate language in the Contract, the agreement did explicitly provide that the contractual provisions

were subject to the approval of DDOT, or the "location owner [or] transit

company." The DDOT is a governmental entity. The Court is not persuaded by the

District's argument that it could not have known that it was waiving its

constitutional rights by entering into an agreement with a private entity. The Court

grants the City's Motion to Dismiss as it pertains to the District's First Amendment

claims.

## B. Qualified Immunity

Defendants argue that Mayor Duggan is entitled to qualified immunity. As

recently stated by the Supreme Court:

> The doctrine of qualified immunity shields officials from civil liability
> so long as their conduct does not violate clearly established statutory or
> constitutional rights of which a reasonable person would have known.
> A clearly established right is one that is sufficiently clear that every
> reasonable official would have understood that what he is doing
> violates that right. We do not require a case directly on point, but
> existing precedent must have placed the statutory or constitutional
> question beyond debate. Put simply, qualified immunity protects all
> but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks

omitted). Qualified immunity is a two-step process. *Saucier v. Katz*, 533 U.S.

194 (2001). First, the Court determines whether, based upon the applicable

law, the facts viewed in a light most favorable to the plaintiff show that a

constitutional violation has occurred. Second, the Court considers whether the

violation involved a clearly established constitutional right of which a

reasonable person in the defendant's position would have known. *Saucier v. Katz, supra.*; *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005). Only if the undisputed facts or the evidence, viewed in a light most favorable to the plaintiff, fail to establish a prima facie violation of clear constitutional law can this court find that the Defendants are entitled to qualified immunity. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).

Once a government official has raised the defense of qualified immunity, the plaintiff "bears the ultimate burden of proof to show that the [official is] not entitled to qualified immunity." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation omitted).

The District argues that Mayor Duggan intentionally targeted the River Rouge School District and interfered with its Free Speech rights when he terminated the District's DDOT Contract with Outfront. In response, the City argues that Mayor Duggan is entitled to qualified immunity because he reasonably believed that the District's Contract was a valid waiver of the District's First Amendment rights.

The Complaint alleges that the District had a First Amendment right to advertise on DDOT's buses despite the contractual provisions noted above. The District alleges that Mayor Duggan violated that right by terminating River Rouge's Contract. The relevant question is whether a reasonable person could

have believed that Mayor Duggan's actions were lawful, "in light of clearly established law and the information" that Mayor Duggan possessed at the time. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Against the backdrop of a motion to dismiss, courts must accept the District's allegations as true. Courts must then ask and determine the question, would any reasonable official in Defendant's position have known that his actions, as expressed in the Complaint, violated plaintiff's clearly established rights? When answering this question, the Court must consider the fact-specific, "particularized" nature of the first inquiry, and ascertain whether, under the Complaint allegations, Defendant should have known what he was doing, specifically, was illegal under preexisting law. And "where a plaintiff fails to allege sufficient allegations to withstand the qualified immunity defense, it is proper to grant a motion to dismiss." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).

To determine whether Mayor Duggan is entitled to qualified immunity, the Court must first review the allegations from the Complaint. The Complaint alleges, under the First Amendment, that Mayor Duggan targeted the District in his State of the City Address, casting them in a negative light. And that Mayor Duggan engaged in viewpoint discrimination by terminating the District's contract with Outfront to display advertisements on DDOT buses, while simultaneously allowing Detroit public and charter schools to continue advertising on DDOT buses.

The City argues that it must establish "beyond debate" that Mayor Duggan's conduct was unreasonable, given existing precedent. *Mullenix*, 136 S.Ct. at 309. Citing *Mullenix*, the District asserts that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 308. The District uses similar language from *Malley v. Briggs* to argue that qualified immunity protects all but "those who knowingly violate the law." 475 U.S. 335, 341 (1941). What the District does not acknowledge, however, is that Mayor Duggan could not have knowingly violated the law, if he believed that the District's Contract was a valid waiver of constitutional rights.

The District further argues that granting qualified immunity at this stage is premature and that discovery is necessary to determine whether Mayor Duggan "actually knew" about the waiver. [ECF No. 18, Pg.ID, 137]. The District also claims that Mayor Duggan cannot "simply condition forum participation on a waiver of free speech rights" to justify his unlawful behavior. [*Id.* at n. 8] Although the District argues that Mayor Duggan inappropriately targeted the District in his State of the City Address, the City indicates that Mayor Duggan simply referred to the District's robust busing operation in Detroit while advocating for a similar busing operation for Detroit public and charter schools. [ECF No. 14, Pg.ID 65]

The City also asserts that Mayor Duggan's actions were appropriate because his remarks were made in front of the media in his official capacity. *See Buckley v.*

13

*Fitzsimmons*, 509 U.S. 259, 277-78 (1993); *see also Goldstein v. Galvin*, 2012 WL 4481206, at *1 (D. Mass. Sept. 28, 2012).  The question is not whether Mayor Duggan's actions were permissible or justified, but whether they were reasonable. *Compare Lavigne v. Forshee*, 861 N.W.2d 635, 644 (Mich. Ct. App. 2014) (declining to grant qualified immunity to a police officer who should have known that voluntary consent cannot be inferred from nonverbal acquiesce to an officer's assertion that he can lawfully enter the home) *with Wolfel v. Morris*, 972 F.2d 712, 720 (6th Cir. 1992) ("[S]ince the defendants *reasonably relied on* and applied valid regulations, they are entitled to qualified immunity for their actions.") (emphasis added).

Courts have been known to invalidate waivers of constitutional rights. *See Davies v. Grossmont Union High School*, 930 F.2d 1390, 1400 (9th Cir. 1991) ("[W]e hold that the waiver provision in the settlement agreement between the [defendant and the plaintiff] is void insofar as it purports to bar [the plaintiff] from ever seeking or holding elective office in the District."). However, the caselaw on waivers shows that his actions were not "patently and flagrantly unconstitutional." *Rumery*, 480 U.S. at 386; *see also Prak v. Gregart*; *see also Prose v. Wendover*, 96 F. App'x 358, 364 (6th Cir. 2004) (concluding that the defendants did not violate the First Amendment by attempting to enforce a city ordinance because it was apparently unconstitutional due to a lack of judicial interpretation). The District

14

provides no caselaw to support its contention that Mayor Duggan cannot rely upon valid waivers of constitutional rights. Given the case law allowing the waiver of constitutional rights, *see Rumery*, 480 U.S. at 392, the Court is unconvinced by the District's argument. The Court finds that Mayor Duggan is entitled to qualified immunity.

### III.   CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED that Defendants Michael E. Duggan and Detroit Department of Transportation's Motion to Dismiss **[ECF No. 14]** is **GRANTED**. Defendants Michael E. Duggan and Detroit Department of Transportation are **DISMISSED** from this action.

IT IS FURTHER ORDERED that this action is DISMISSED and designated as CLOSED on the Court's docket.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED:  September 30, 2024

15